IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**UNITED STATES OF AMERICA** §
§
v. § Criminal No. **3:10-CR-56-L**
§
**TARSL DIXON** §

## MEMORANDUM OPINION AND ORDER

Before the court is the Government's Motion to Reconsider Order to Suppress Evidence, filed September 20, 2010. After careful consideration of the motion, briefs of the parties, reply, record, and applicable law, the court **denies** the Government's Motion to Reconsider Order to Suppress Evidence.

### I. Introduction and Background

On September 3, 2010, the court granted Defendant Tarsl Dixon's Motion to Suppress Evidence. The Government contends that the court erred in granting Defendant Tarsl Dixon's Motion to Suppress Evidence. As the bases for this contention, the Government argues:

> The Court held that a reasonable person would not feel free to refuse a request to get out of a car because it came from an officer "dressed in full uniform with a holstered side firearm." The Government respectfully asks the Court to reconsider that since the Supreme Court has said "those factors should have little weight in the analysis." Also, the Court held that the officers were not justified under the Fourth Amendment to detain Ms. Dixon because they subjectively believed they lacked a sufficient basis to do so. The Government respectfully asks the Court reconsider that since the Supreme Court has said the subjective intentions, motivations, or beliefs of police officers "play no role" in the analysis.

Gov.'s Br. in Supp. of Mot. to Recons. 1 (footnote omitted). Defendant Tarsl Dixon ("Dixon") counters that the court's decision was correct and urges the court to deny the government's motion. The court agrees with Dixon, as the government misconstrues the court's earlier holding.

The court will not restate all that was in its previous ruling regarding the motion to suppress, but it will discuss some points previously made in addressing the government's motion to reconsider. Moreover, this opinion supplements the court's earlier ruling, which is made a part of this decision as if it is repeated herein verbatim. Because of the motion to reconsider, the court is now required to expand on matters that it preferred not to discuss in detail in its original decision for concluding that the totality of the circumstances shows that a reasonable person would not believe that she was free to leave the parking lot when Ralson told her to step out of the car, and that the seizure violated the Fourth Amendment. The court will be more direct in its assessment of this matter.

In the early evening of October 3, 2009, the Dallas Police Department received a complaint from an anonymous 911-caller at approximately 5:31 p.m. The caller stated that a black female in a blue Chrysler was waving a gun around in the parking lot of the Highland Hills apartment complex. Dallas police officers Phillip Ralson ("Ralson") and Daniel Lee Harris ("Harris") were immediately dispatched and arrived at the apartment complex approximately four minutes after receipt of the call. After approximately two minutes of searching the parking lot, the officers located a car that fit the 911-caller's description of a "blue Chrysler." The officers also observed a black female, later identified as Dixon, in the driver's seat.

Ralson approached the vehicle and tapped on the driver's side window, and Dixon rolled down the window. Initially, the engine of Dixon's car was not running. Ralson initiated a

conversation with Dixon. During the initial encounter, Ralson asked Dixon whether she lived at the apartment complex, and Dixon responded that she did not live at the complex, that she had taken a friend to an apartment at the complex, and that she was waiting for her friend to return from the apartment. At some point during the initial encounter, Dixon asked the officers "why were [they] bothering her." The record does not indicate what Ralson told Dixon in response to this question. During the conversation, Ralson asked or instructed Dixon to turn off the radio because he could not hear her too well.

What happened next is disputed. Ralson testified at the hearing on August 26, 2010, that when Dixon leaned forward to turn off the radio, the front pocket of her hooded sweatshirt opened, allowing him to see the cylinder of a firearm (a North Arms, Model .22 Long Rifle, .22 caliber revolver). He testified that after he saw the firearm, he asked or told Dixon to step out of the car. The arrest report prepared by Harris, and reviewed by Ralson immediately following the incident, however, tells a different story. The arrest report reflects that after Dixon rolled down the window, she was told or asked to step out of the car. It states that Dixon was asked to step out of the vehicle *before* Ralson saw a firearm and makes clear that Ralson saw a small silver revolver in the pocket of Dixon's hooded sweatshirt *only* when she opened the driver's side door to exit the vehicle after Ralson had directed her to do so. The arrest report reflects that Dixon was complying with Ralson's order to get out of the car. Ralson testified that this was an error in the arrest report. The arrest report, however, says nothing about Dixon leaning forward to turn off the radio or that Ralson had difficulty hearing Dixon.

The remaining facts are not in dispute. After Dixon stepped out of the vehicle, a brief struggle ensued. The struggled caused the firearm to fall out of Dixon's sweatshirt pocket and land

underneath the vehicle. One of the officers recovered the firearm from underneath the car, and Dixon was arrested. She was ultimately indicted on March 2, 2010, on one count for felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Dixon filed a motion to suppress evidence on August 2, 2010, contending that the seizure of the firearm was the result of an illegal seizure. This court held a suppression hearing and ultimately granted Dixon's Motion to Suppress Evidence on September 3, 2010. The government now requests the court to reconsider its earlier ruling.

## II.     Legal Standard

A district court is equipped to not only retain jurisdiction of its cases, it is free to reconsider its own earlier decision on suppression of evidence. *United States v. Scott,* 524 F.2d 465, 467 (5th Cir. 1975). In ruling on the government's motion, the court employs a familiar standard. "Searches and seizures of motorists suspected of criminal activity are analyzed under the framework established in *Terry*." *United States v. Jaquez,* 421 F.3d 338, 340 (5th Cir. 2005) (citation omitted). Furthermore, "an investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. An officer's mere hunch or unparticularized suspicion is not sufficient; rather, a minimal level of objective justification for the stop must be present." *Id.* at 340-41 (internal quotations and citations omitted). The burden is on the government to show "the reasonableness of a warrantless search or seizure." *Id.* at 341.

## III.    Analysis

The government's contentions on reconsideration are two-fold. First, the government contends that this court incorrectly applied a subjective standard to analyze whether the encounter

between the officer and Dixon was consensual. Second, the government contends that the officers had a sufficient basis under *Terry*[1] to detain Dixon. The court addresses each issue separately.

> **A. The Encounter Became Nonconsensual at the Time Ralson Told Dixon to Step Out of Her Vehicle.**

The government contends that this court should use an objective standard to determine whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave. The government also argues that the totality of the circumstances indicate that the encounter was consensual. Dixon responds that the seizure was non-consensual because, in view of all the circumstances, a reasonable person would not believe that she was free to leave. The court agrees.

Contrary to the government's assertion, the court applied an objective standard in reaching its conclusion. While the court at one point made a reference to Ralson's motive, the reference was made to show that Ralson had no objective basis to detain Dixon and that his intentions further undermined his credibility. The court determines that Ralson's testimony is not credible on key facts. This determination is based on the inconsistencies between his testimony and the arrest report; his demeanor, reticence, and unsureness in answering questions on the stand; and his rigid and irrational position that he saw only the cylinder of the revolver, despite such statement being highly unlikely or impossible under the circumstances. The court is unable to tell whether Ralson's version is fabricated or the result of memory lapse because of the passage of time. In any event, whether a fabrication or lapse of memory, his credibility is seriously undermined and cannot serve as a basis for an accurate account of what transpired during the encounter.

---

[1]*Terry v. Ohio*, 392 U.S. 1 (1968).

**Memorandum Opinion and Order- Page 5**

As stated by the Supreme Court, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citation omitted). The court holds that the officers were certainly free to approach Dixon initially; however, for reasons previously discussed and supplemented herein, the encounter went beyond consensual and constituted a seizure in violation of the Fourth Amendment. The key in determining if a seizure has occurred within the meaning of the Fourth Amendment is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citation omitted).

The government contends that "[t]he court held that a reasonable person would not feel free to refuse a request to get out of a car because it came from an officer 'dressed in full uniform with a holstered side firearm.'" Gov.'s Brief in Supp. of Mot. to Recons. 1. The government takes this statement totally out of context, and the statement by the court regarding a uniformed officer with a holstered side firearm is of no moment and much ado about nothing. The court merely included a description of how the officer was dressed and equipped to show that he was fully vested with the authority of the state and that there was no question regarding his authority and identity. That an officer is "in uniform or visually armed" has "little weight in the analysis" as to whether the contact is consensual or coercive. *Drayton*, 536 U.S. at 204. The court simply was emphasizing that Dixon knew that the men were police officers. This would have equally been true had the officers been in plainclothes, identified themselves as police officers, and shown Dixon their badges and identifications. Whether the officers were in plainclothes or full uniform is not the issue and is quite

**Memorandum Opinion and Order- Page 6**

beside the point, because Dixon would have known that the men who approached her were police officers by their uniforms, or badges and identifications.

Had the officers been in plainclothes and so identified themselves, the court would have made the same statement and noted that the officers were in plainclothes. The issue is not how the officers were attired but whether Dixon knew that they were police officers. Whether the officers were in uniform or plainclothes, they had the official and full authority of the state behind them and the power to detain or arrest, and Dixon or a reasonable person would have known this. For these reasons, the court's statement that the officers were in full uniform and carrying a holstered firearm does not alter the earlier result reached by the court.

First, Dixon was alone in the parking lot. No mention is made of other persons being around when she was approached by the officers. The government relies heavily on *Drayton* to support the constitutionality of the encounter and ultimate seizure of Dixon. In *Drayton,* the Court held that plainclothes police officers did not "seize" passengers on a bus when, as part of routine drug and weapons interdiction effort, they boarded it at a rest stop and began asking the passengers questions. *Drayton,* 536 U.S. at 193. The plainclothes officers approached individual passengers, identified themselves as officers, and declared that they were looking for drugs and weapons. *Id.* at 198-99. Upon approaching the defendants, the officers asked them whether they had any bags and whether the bags contained any contraband. *Id.* at 199. The officers did not find any contraband but asked the defendants whether they could search their persons. The defendants consented, and the subsequent searches revealed bundles of cocaine on both individuals. *Id.* The Court determined that the ultimate inquiry for a seizure is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 202. In determining the totality of

the circumstances, the Court took into account that many of the defendants' fellow passengers were present to witness the officers' conduct and that the officers did nothing to suggest that the passengers could not leave the bus. *Id.* at 204-05.

Moreover, in *Drayton*, the passengers *consented* to the search. Dixon did not consent to anything and did not voluntarily exit her vehicle. Ralson ordered her to step out of the car because he stated that he saw the cylinder of a revolver in her sweatshirt front pocket, although this testimony is totally inconsistent with the facts as set forth in the arrest report. The court simply does not believe that Ralson saw the revolver before he ordered Dixon out of the vehicle. The only evidence that supports Ralson is his testimony some *ten months after* the incident, which does not square with the arrest report and, for reasons later discussed, makes no sense.

In *Drayton,* the Court specifically noted that "because many fellow passengers [were] present to witness [the] officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." *Id.* at 204. Here, Dixon was alone, and a reasonable person certainly could have felt insecure in making a decision not to cooperate with police, even though the government's exhibit shows that Dixon had the opportunity to exit the parking lot in several ways. Gov't Ex. 4.

Second, Ralson had to tap on the window to get Dixon's attention. She only rolled down the window after Ralson tapped on it, indicating that he wanted to talk to her. Dixon's reluctance or initial refusal to roll down the window when she saw the officer approach indicates an unwillingness to engage them.

Third, once the conversation started, Dixon asked the officer why they were bothering her. The word "bother" means "1: to annoy esp. by petty provocation: irk 2: to intrude upon: pester."

Merriam-Webster's Collegiate Dictionary 145 (11th ed. 2004). A reasonable person would interpret this statement to mean that the speaker did not want to talk to the police officers and wanted to be left alone; otherwise, the statement is nonsensical and of no import.

Fourth, because of the detailed explanation that follows, the court determines "articulable facts that criminal activity may [have been] afoot," were lacking, and Ralson had no justification for ordering Dixon out of her vehicle. *See Jaquez*, 421 F.3d at 340. The court's determination is supported by the testimony of Ralson and Harris and, moreover, the government initially appeared to concede this point. Ralson and Harris both testified that, had Dixon decided not to respond to Ralson and had driven away when he approached, the officers would have had no reason to stop her. When asked by the court if the officers would have let Dixon go, Harris responded, "We would have had to." When the court asked Ralson whether Dixon would have been free to go, he stated, "I would have tried to see if there was some reason to stop her on traffic, but other than that, I had really no other reason." While Harris acknowledged that no basis existed to detain Dixon had she decided to leave prior to Ralson alleging seeing the gun, Ralson's answer clearly revealed that he would have tried to find some basis to detain Dixon, which this court believes further undercuts his credibility.

Although the government argues that all contact between Dixon and Ralson was consensual, including Dixon's "acquiescence" to Ralson's "request" that she exit the vehicle, the court determines that whether Ralson's "request" was a question or an order is a distinction without a difference. Upon inquiry by the court, the government essentially conceded that a reasonable person in Dixon's position would not have believed she was free to go when "asked" by Ralson, a police fully vested with the official authority of the state, to step out of the car. In response to the court's

**Memorandum Opinion and Order- Page 9**

inquiry on what a reasonable person would do, the government's attorney stated, "I would get out of the car and talk to the officer. I would say I would do the same thing as Ms. Dixon did, get out of the car." Hr'g Tr. 122-23. The reason that the government's attorney so responded is because the objective facts show that a reasonable person in Dixon's situation would have felt that she was not free to leave and that she could not ignore the officer's directive. That a reasonable person would believe that she is free to leave after being "asked" to step out of the car by a person known to be a police officer with the ability to enforce that "request" strains credulity. A reasonable person would have believed she had no choice but to exit the vehicle. The court accordingly cannot say that Dixon *consented* to exiting the vehicle when "asked" by Ralson. This, coupled with Ralson's and Harris's testimony that Dixon would have been free to go before being asked to step outside her car, the court's determination that arrest report gives the correct account of what transpired, and Ralson's lack of credibility, solidifies the court's determination that ordering Dixon out of the vehicle constituted a "seizure" under *Terry*, and that such seizure was not justified by articulable facts of criminal activity.

Ralson testified that there *was* an articulable fact indicative of criminal activity before he ordered Dixon out of the car: his observation of Dixon's firearm. This, however, does not square with the arrest report. The arrest report states that Ralson observed the firearm as Dixon opened the door to get out of the car, only *after* she had been ordered out of the vehicle.[2] Harris unequivocally testified that he did not see the firearm at all until after Dixon was outside of her vehicle and the

---

[2]The court recognizes that a portion of the arrest report supplement states that Harris observed the gun in plain sight while Dixon was seated in the car. This particular portion of the arrest report is contained in the affidavit for an arrest warrant filed by Officer S.W. Griffis. It is clear to the court that this statement is incorrect because it contradicts the plain language of the narrative portion of the arrest report and incorrectly summarizes its key provisions. Moreover, Griffis was not present when Dixon was arrested.

**Memorandum Opinion and Order- Page 10**

weapon fell to the ground. The court accordingly determines that resolution of this matter turns solely on credibility and that its acceptance of one version of events precludes its acceptance of the other. The arrest report and Ralson's testimony cannot both be correct, and they cannot be harmonized.

If the court accepts the arrest report as written, Ralson had no basis to order Dixon out of the vehicle, and the seizure was unreasonable under *Terry* and violated the Fourth Amendment. On the other hand, if the court accepts Ralson's testimony as stated, he had a sufficient basis for ordering Dixon out of the vehicle after observing the firearm, which would have been a reasonable seizure under *Terry* and not a violation of the Fourth Amendment.

Although Ralson testified that the arrest report is erroneous, the court is puzzled that such a critical error would have gone unnoticed and uncorrected. This seemingly small difference in detail between the arrest report and Ralson's testimony, which is of sizeable magnitude, and Ralson's credibility are key to the court's decision. Harris testified that he prepared the arrest report and that Ralson reviewed and submitted it. Testimony also established that the jail sergeant at the book-in desk reviewed the arrest report prior to its submission. Ralson testified that the error was not brought to his attention until two weeks before the court's August 26, 2010 evidentiary hearing, and that it was the government (not his police superiors) who spotted it. Ralson further testified that he is certain there is a way to supplement or amend arrest reports for errors, but he does not know the process for doing so. The narrative portion of the arrest report was never amended, supplemented, or otherwise corrected.

The events giving rise to this case occurred on October 3, 2009, and the arrest report was prepared on the same day. More than ten months passed before Ralson first learned of the error in

the arrest report. The court can reasonably infer that Ralson has conducted or been involved with numerous arrests and investigations since the evening of October 3, 2009. In light of this, the court seriously questions how Ralson's memory as to this single incident can be so crystal clear insofar as recalling that he saw the firearm *before* ordering Dixon out of the vehicle, when the arrest report expressly states the contrary. In essence, his testimony rewrote this critical portion of the arrest report. As a practical matter, observations that are recorded in closer temporal proximity to the event in question are more likely to be an accurate depiction of the event, because one's memory fades with the passage of time.

Ralson acknowledged the need for accuracy in preparing arrest reports and the reality that such reports could be used in subsequent court proceedings. The incentive to reflect accurately the sequence of events is therefore compelling. Further, there is a natural tendency to record events in the order that they occur. For these reasons, the court finds that the sequence of events in the arrest report more likely reflects what happened on October 3, 2009, and is therefore more reliable than what Ralson tried to recollect and piece together after ten months.

Ralson's testimony at the hearing also sheds light on his motivation for investigating Dixon: he wanted to detain her until he found something of a criminal nature. Ralson explicitly stated that he "would have tried to see if there was some reason to stop her on traffic" had she driven away. The court realizes that the subjective intent of a police officer is irrelevant as long as objective facts justify the officer's actions. *Whren v. United States*, 517 U.S. 806, 813 (1996) (citation omitted). The court, however, does not find that objective facts were present, and Ralson's motive further undermines his credibility. Was his goal was to determine whether criminal activity was afoot using

objective standards consistent with the anonymous tip, or was it "to find something" on Dixon by "putting the cart before the horse"?

Further, the court is unconvinced that Ralson was even able to see the firearm from his vantage point on the driver's side of Dixon's vehicle. The government stipulated that Dixon is right-handed, which suggests that she ordinarily would have placed the gun in the right side of the opening of her sweatshirt pocket. Ralson could have only seen the left opening of the pocket from where he was standing. The gun itself is extraordinarily tiny, no longer than the palm of an average-size person's hand. The gun is slightly under four inches long overall, has a barrel that is one and one-eighth inches long, has a cylinder that is three-fourth inch wide and one and one-eighth inches long. It would not have created a recognizable bulge in the pocket, especially in the type of hooded sweatshirt that Dixon was wearing, and it is unlikely that it could have been seen from the left if it had been placed in the pocket's right side. Ralson's insistent statements that he observed *only* the "cylinder" of the gun—as opposed to the barrel or the handle, a portion of the barrel and cylinder, or a portion of the handle and cylinder—makes the court further question his testimony. The court is uncertain how only the cylinder (the middle part of the gun) could be seen under the circumstances without also observing the gun's handle or barrel, or at least of portion of one of these parts of the gun. Ralson provided no testimony that there were any other objects in Dixon's sweatshirt pocket that obscured his view of the barrel or handle, leaving only the cylinder or a part of it exposed.

The court also finds this testimony problematic for several other reasons. Ralson testified, "and she [Dixon] leaned over to turn the car off, I saw the cylinder of a revolver of the front pocket of like a hooded sweat shirt [sic], the front pocket all the way through." Hr'g Tr. 14. First,

assuming that Ralson could see "all the way through" the front pocket, it is highly unlikely, if not impossible, that he would have only seen the middle part of the revolver. Second, considering the natural folds of a sweatshirt, and the contours of the human body at the midsection and how it expands when one is seated, it is unlikely, if not impossible, that Ralson could have seen "all the way through" the front pocket of the hooded sweatshirt. As defense counsel pointed out at the hearing, to which Ralson agreed, Dixon is not a "petite woman." The arrest report lists her height at five feet and seven inches, and her weight at 225 pounds. The sweatshirt introduced at the hearing was a size "Medium," and it would not have been hanging loose on a woman of Dixon's size. Dixon's daughter, Shantae Anthony, testified that the sweatshirt "fits rather snug or tight on [Dixon]" and that the front pocket would not "open up" if Dixon leaned forward.

The government, in its response to Dixon's motion to suppress, acknowledged that there was an error in the arrest report. The arrest report states that Ralson observed the firearm after ordering Dixon out of the vehicle. In its acknowledgment, the government stated that, after meeting with Ralson, he recalled seeing the gun *barrel* first and then asked Dixon to step out of the vehicle. This acknowledgment offers no assistance to the government's position because Ralson repeatedly and insistently testified at the hearing that he saw only the *cylinder* of the gun. The cylinder and the barrel of a revolver, of course, are two distinct parts of the firearm. The barrel is the hollow passage or tube that allows for discharge of a bullet or cartridge. The cylinder is the revolving portion that is chambered to hold the bullets or cartridges. The court reasonably infers Ralson, a police officer of five years, knows the difference between the two. The only reasonable basis for the government's acknowledgment is that it recognized how nonsensical Ralson's testimony would be on this key point. The government made a valiant attempt to recast Ralson's testimony, explain to the court that

**Memorandum Opinion and Order- Page 14**

he saw the barrel of the gun rather than the cylinder, and lift him from the hole that he had dug; however, Ralson remained importunate, as he continued to dig and undermine his credibility by insisting that he saw the cylinder.

Because Ralson's credibility, for the reasons herein stated, has been severely discredited, the court cannot accept his account of the events regarding the revolver and when he saw it. Harris did not see a revolver until it fell to the ground underneath the car. Because of the inconsistencies and irrational position taken by Ralson regarding the cylinder, the court does not believe that Ralson saw the gun while Dixon was seated in the car. The court is convinced that Ralson did not see it until sometime after he ordered Dixon to step out of the vehicle and a struggle ensued. Accordingly, there was no legal basis — reasonable suspicion, probable cause, or otherwise — for him to order Dixon to step out of the vehicle. Ordering Dixon out of the car was not justified by *Terry*. Nothing had been done by the officers to determine the reliability of the anonymous tip as to criminal activity on Dixon's part or as to officer safety. Considering all the circumstances surrounding the encounter between Dixon and the officers, the court concludes that a reasonable person would not have believed that Dixon was free to leave once Ralson told her to step out of the vehicle.

**B.    The Anonymous Tip Did Not Provide a Sufficient Basis to Develop Reasonable Suspicion that Criminal Activity was Afoot.**

The government contends that the officers had a sufficient basis under *Terry v. Ohio,* 392 U.S. 1 (1968), to order Dixon out of her car and briefly detain her. Defendant responds that after examining the totality of the circumstances, the officers did not have reasonable suspicion to detain her. The court previously held that the government failed to carry its burden and show that the seizure of Dixon was reasonable.

The government contends that the officers had a reasonable belief that Dixon was armed and dangerous based on the anonymous tip. Gov't Br. at 9. The government further asserts that "the court determined [that the tip] was reliable." *Id.* The government misconstrues what the court said about the reliability of the tip. In its opinion, the court "determin[ed] that the 911-caller's complaint was reliable to the extent that it provided a sufficient description of the person whom the anonymous tipster meant to accuse." Mem. Order & Op. at 4. The court did not state that the caller was reliable with respect to the *content* of the tip as to whether criminal activity was afoot. The court found that the caller was reliable *solely* as to the description of the person and the vehicle.

A tip by an informant must itself be reliable and specific enough to give rise to a reasonable suspicion that a defendant is engaged in criminal activity. Insofar as relying on an informant's tip to investigate a suspect for criminal activity, such tips, "like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972). "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Id.* When a tip is provided anonymously, "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). "Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. Reasonable suspicion at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* (citation omitted). "[A]n anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274.

Relevant factors to consider with respect to whether an indicia of reliability is present and whether a reasonable suspicion justifies a seizure under the Fourth Amendment include:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

*United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007) (quoting *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999)). When a tip is provided by an anonymous caller and the caller's "credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining factors." *United States v. Gomez*, 623 F. 3d 265, 269 (5th Cir. 2010) (citation omitted). The reliability of the informant in this case could not be established by the tip alone.

In considering the factors under *Martinez*, the first factor provides the court with no indicia of reliability regarding the unknown caller, as the officers knew nothing about the caller and took no steps to contact the anonymous caller to determine the reliability of the tip with respect to its assertion of illegality. The court knows nothing about the caller, and the officers did nothing to investigate the credibility and reliability of the caller.

With respect to the second and third factors, the court determines that specificity and corroboration were lacking at the time of the officers' encounter with Dixon. There was no verified information that criminal activity was afoot, and the police officers had no other basis for believing the truth of the information provided by the anonymous caller. The officers had done nothing to verify or corroborate the information provided by the caller as to its assertions of illegality. Although Ralson testified that he saw a revolver on Dixon before he ordered her out of the car, the

court discounts this testimony and does not believe that Ralson saw the gun until after the struggle. As the court determines credibility and the weight to give to the testimony of a witness, it concludes that Ralson's testimony cannot serve as the basis for reasonable suspicion or probable cause to detain or arrest Dixon.[3]

In arguing that the officers had reasonable suspicion to stop and briefly detain Dixon, the government relies upon three cases: *Pennsylvania v. Mimms,* 434 U.S. 106 (1977); *Whren v. United States,* 517 U.S. 806 (1996); and *Ohio v. Robinette,* 519 U.S. 33 (1996). Rather than engage in a constitutional exegesis of these three cases, the court simply notes that they are distinguishable and inapplicable to the facts and circumstances of this case. In all three cases, either reasonable suspicion or probable cause existed to detain the individuals or arrest them; thus, no violation of the Fourth Amendment occurred. The court fully realizes that once reasonable suspicion or probable cause exists to detain or stop, a police officer may order the individual to step out of a vehicle; however, as the court has stated several times, neither existed to detain Dixon in this case.

As previously stated, the government has the burden of showing the reasonableness of a warrantless search or seizure. *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995). Under the totality of the circumstances, and for the reasons herein stated, the court determines that the government has failed to carry its burden and show that the seizure of Dixon was reasonable. The government's evidence and the court's findings do not establish that Ralson observed the firearm in Dixon's possession before he ordered her out of the vehicle, and he had no legal basis to do so. *Terry* did not provide a sufficient basis for Ralson ordering Dixon to step out of the vehicle.

---

[3]In light of its analysis, the court finds it unnecessary to address the fourth factor set forth in *Martinez*.

**Memorandum Opinion and Order- Page 18**

Accordingly, the seizure of Dixon violated the Fourth Amendment's prohibition against unreasonable seizures.

## IV. Conclusion

For the reasons stated herein, the court **denies** the Government's Motion to Reconsider Order to Suppress Evidence. Accordingly, the North Arms, Model .22 Long Rifle, .22 caliber revolver, serial number L10672, recovered by the officers on October 3, 2009, and any other evidence seized while Dixon was in police custody will be **excluded** at trial. Further, the court will **exclude** all testimony by Ralson and Harris concerning the revolver. During trial, the government will not be permitted to admit, produce, or refer to any evidence seized as a result of the October 3, 2009 arrest of Dixon.

**It is so ordered** this 23rd day of December, 2011.

_____
Sam A. Lindsay
United States District Judge